**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 26-cv-04832

THE STATE OF COLORADO,

Plaintiff,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,
DAVID J. VENTURELLA, in his official capacity as Senior Official performing the duties of the Director of Immigration and Customs Enforcement,

Defendants.

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

Plaintiff, the State of Colorado, through its Attorney General, hereby alleges the following:

## INTRODUCTION

1. The State of Colorado brings this action seeking declaratory and injunctive relief under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., and the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(g), to halt Defendants' unlawful action to establish an immigration detention facility in the town of Hudson, Colorado at the site of the former Hudson Correctional Facility. Defendants have ignored their statutory duties to consider the potential environmental impacts of the facility, provide information to the public, and arrange for civil immigration detention only in places appropriate for it.

2. On July 9, 2026, Defendants U.S. Department of Homeland Security ("DHS") and U.S. Immigration and Customs Enforcement ("ICE") announced they had entered a five-year contract valued at over $500 million with a private corporation, The GEO Group, Inc., to renovate and operate a long-dormant prison as a 1,200-bed private immigration detention facility, known as the Big Horn facility, in the town of Hudson, Colorado, which has a population of just over 1,650 people.

3. In their rush to expand detention capacity across the country, DHS and ICE have ignored their legal obligation to first determine what effect their actions would have on nearby residents and the surrounding environment and to arrange for an appropriate place for detention of civil immigration detainees, in violation of NEPA, the INA, and the APA.

4. NEPA requires federal agencies to study potential environmental impacts of major federal actions and document the results of their analysis *before* taking final action, ensuring both that environmental considerations are integrated into the decision-making process and that States, members of the public, and other interested parties have access to information so that they may play an informed role in the decision-making process. Instead, Defendants have operated under a shroud of secrecy in their plans for the facility, displaying a complete disregard for these requirements.

5. Defendants' plan to reopen the correctional facility as an immigration detention center may have impacts on the surrounding environment that they are obligated to review and consider before taking final action. The facility has not housed anyone for approximately 13 years. Because Defendants have failed to conduct any public environmental analysis, the State has no

information about the extent of the work and repairs that need to be undertaken at the facility to make it suitable to house people again.

6. Renovating the facility for Defendants' intended purposes will require construction and/or renovation with resulting environmental impacts. Because Defendants have not fulfilled their obligations to share information, the extent of those impacts is unknown to the State and public. Despite this, Defendants have already issued contracts for significant sums of money to supervise an operational facility, underscoring the finality of their plan. Upon information and belief, construction and/or renovation activities have begun at the facility.

7. Given the potential impacts of Defendants' plan on the surrounding environment, Defendants have requirements under NEPA to either (1) compile an environmental impact statement; (2) conduct an environmental assessment (resulting in either a formal, public finding of no significant environmental impact or compilation of an environmental impact statement); or (3) identify a categorical exclusion applicable to the action that exempts it from additional environmental review. Whether Defendants compile an environmental impact statement, conduct an environmental assessment, or rely on a categorical exclusion, they are required to complete and document their review prior to taking final action. Upon information and belief, Defendants have not done any of the above.

8. In addition, Defendants have failed to satisfy their obligation to "arrange for appropriate places of detention" under the INA. In its current condition, the facility almost certainly does not have appropriate water and wastewater infrastructure to safely and humanely detain over a thousand people. In addition, at full capacity the facility would nearly double the town's population while increasing traffic and congestion due to the transportation of detainees to

and from the facility, causing strain on local resources and infrastructure—including water, sewage, roads, and emergency services—and further constraining the Defendants' ability to ensure that individuals are detained appropriately.

9. Defendants have ignored their statutory obligations and provided no information to the State about their plans, depriving the State of the information needed to fully assess the harm Defendants' actions will have on Colorado's sovereign interests. Defendants' actions are unlawful under NEPA, the INA, and the APA. As such, this court should vacate and set aside Defendant's contract with the GEO Group to renovate and operate the Big Horn facility; enjoin further work on the facility, including further construction and renovation needed to make the facility operable as a civil immigration detention center; and remand the matter to the agencies to prepare an environmental assessment or environmental impact statement under NEPA and document their compliance with the INA.

**PARTIES**

10. Plaintiff State of Colorado is a sovereign State in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General is the chief legal representative of the State and is authorized by Colorado Revised Statutes § 24-31-101 to pursue this action on behalf of the State of Colorado.

11. Defendant DHS is a cabinet agency within the executive branch of the United States government. 6 U.S.C. § 111. DHS is a federal agency within the meaning of 5 U.S.C. § 551(1).

12. Defendant Markwayne Mullin is Secretary of Homeland Security and DHS's highest-ranking official. 6 U.S.C. § 112. He is sued in his official capacity.

13. Defendant ICE is a law enforcement sub-agency within DHS. 6 U.S.C. § 252. ICE is a federal agency within the meaning of 5 U.S.C. § 551(1).

14. Defendant David Venturella is the Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement and Immigration and Customs Enforcement's highest-ranking official. 6 U.S.C. 252(a)(2). He is sued in his official capacity. Defendants DHS, Markwayne Mullin, ICE, and David Venturella are referred to collectively herein as "Defendants."

## JURISDICTION AND VENUE

15. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

16. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff, the State of Colorado, is a sovereign State in the United States of America. A substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within this district.

## LEGAL BACKGROUND

### I. NEPA establishes mandatory procedures for undertaking major agency actions.

17. Congress enacted NEPA "to promote efforts which will prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321. In recognizing "the profound impact of man's activity on the interrelations of all components of the natural environment," and "the critical importance of . . . maintaining environmental quality to the overall welfare and development of man," Congress declared "that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures" to accomplish NEPA's goals. *Id.* § 4331(a).

18. NEPA is a procedural law that requires all federal agencies to assess the environmental impacts of their proposed actions, and inform the public of those impacts, before deciding whether and how to proceed. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Rocky Mountain Wild v. Dallas*, 98 F.4th 1263, 1293 (10th Cir. 2024). By requiring this review in advance, NEPA is intended to "inform agency decisionmaking," *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 173 (2025).

19. For any proposed "major Federal action" that may significantly impact the environment, the federal agency must complete a "detailed statement," known as an environmental impact statement ("EIS"), setting forth the "reasonably foreseeable environmental effects" and "a reasonable range of alternatives." *See, e.g.*, 42 U.S.C. § 4332(2)(C).

20. NEPA applies to a broad range of federal actions. A "major Federal action" is "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A). According to DHS internal policies, "NEPA generally applies to actions to be undertaken, funded, permitted, or otherwise approved by DHS, including activities that may be wholly initiated within DHS, [or] executed by DHS under the direction of Congress." Dep't of Homeland Sec., Instruction Manual 023-01-001-01, Revision 01, *Implementation of the National Environmental Policy Act (NEPA)* at III-1 (Nov. 6, 2014) (hereinafter "DHS Instruction Manual"); *see also* Environmental Planning and Historic Preservation Program, 79 Fed. Reg. 70,538 (Nov. 26, 2014).

21. Agencies must consider a broad range of effects when evaluating an action under NEPA. DHS has specified that NEPA analysis includes consideration of "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected

ecosystems), aesthetic, historic, cultural, economic, social, or health" effects. DHS Instruction Manual at II-2.

22. If an agency does not expect a major federal action to have significant impacts on the environment, or if the significance of such effects is unknown, then the agency "*shall* prepare an environmental assessment" instead of an EIS. 42 U.S.C. § 4336(b)(2) (emphasis added). An environmental assessment ("EA"), although less comprehensive than an EIS, nonetheless "shall be a concise *public* document" that either sets forth the basis for the agency's finding of no significant impact or a determination that an EIS is in fact required. *Id.* (emphasis added).

23. NEPA also allows federal agencies to establish "categorical exclusion[s]"—categories of actions that the agency has determined normally do not significantly affect the quality of the human environment—in its agency-specific NEPA procedures. 42 U.S.C. § 4336e(1). If an agency determines that a categorical exclusion covers a proposed action, the agency will evaluate the proposed action for any extraordinary circumstances in which a normally excluded action may have a significant effect. If there are none, the agency may rely on the categorical exclusion to approve the proposed action without preparing an EA or EIS. 42 U.S.C. § 4336(a)(2). If the extraordinary circumstances have the potential to result in significant effects, the agency is required to prepare an EA or EIS.

24. Even when relying on a categorical exclusion, the agency must identify the categorical exclusion that the agency plans to use for its proposed action and document its compliance with NEPA's requirements before taking final action.

25. DHS's Instruction Manual provides that a categorical exclusion is only appropriate where an action "[c]learly fits the category described in the [categorical exclusion]," "[i]s not a

piece of a larger action," and "[n]o extraordinary circumstances exist." DHS Instruction Manual at V-4–V-5. The proposed action must "clearly meet all three conditions" in order to be categorically excluded. *Id.*

**II. The APA requires federal agencies to engage in reasoned decision-making and explain departures from prior policies.**

26. "The APA 'sets forth the procedures by which federal agencies are accountable to the public.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 16 (2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)). The APA requires courts to "hold unlawful and set aside" agency actions that are arbitrary, capricious, an abuse of discretion, or are contrary to law, to constitutional right, power, privilege or immunity, or are in excess of statutory jurisdiction, authority or limitation, or fall short of statutory right. 5 U.S.C. § 706(2)(A)–(C).

27. At its core, the APA "requires agencies to engage in 'reasoned decisionmaking.'" *Regents of the Univ. of Calif.*, 591 U.S. at 16 (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). Reasoned decision-making means an agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). An agency fails to meet this standard if it "failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

28. When agency action breaks with a prior policy or decision, "the requirement that an agency provide reasoned explanation for its action . . . ordinarily demand[s] that it display

awareness that it is changing position. An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books. And of course the agency must show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citations omitted).

29. Failure to engage in reasoned decision-making runs afoul of the APA's prohibition against agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2).

**III. The INA requires DHS to arrange for "appropriate" places for immigrant detention.**

30. The INA requires that DHS "arrange for appropriate places of [immigrant] detention." 8 U.S.C. § 1231(g)(1).

31. The INA does not define "appropriate." But the plain meaning of that word is "especially suitable or compatible."[1]

32. Under ICE's detention standards, which are set forth in agency guidance documents and do not carry the force of law, facilities are appropriate when they possess "appropriate temperatures, air and water quality, ventilation, lighting, noise levels, and detainee living space, in accordance with federal standards." Facilities must also provide "reasonably private bathing and toileting environment[s] in accordance with safety and security needs."[2]

---

[1] *Appropriate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/appropriate (last accessed Sep. 29, 2026).

[2] ICE, *National Detention Standards* 16, 135 (Revised 2026), https://www.ice.gov/doclib/detention-standards/2026/nds2026.pdf (last accessed Sep. 29, 2026).

## FACTUAL ALLEGATIONS

### IV. Defendants are working to substantially increase immigration detention capacity and have acknowledged this effort is subject to NEPA.

33. Upon information and belief, DHS is working to substantially increase its detention capacity as part of an overall administration policy to carry out the "largest domestic deportation operation in American history."[3]

34. In the past, ICE has typically avoided expanding detention space through ICE-owned facilities "because of the substantial amount of time needed to design and construct such a facility." U.S. Gov't Accountability Off., GAO-21-149, *Immigration Detention: Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts* 13 (Jan. 13, 2021), https://www.gao.gov/assets/gao-21-149.pdf ("[O]fficials said that new contracts for ICE-owned service processing centers are not a viable option because of the substantial amount of time needed to design and construct such a facility, coupled with the fact that ICE does not have construction authority."). A large percentage of ICE detainees are held in facilities either owned or operated by private prison companies.

---

[3] Adriana Gomez Licon, *Trump's Vow to Deport Millions is Undercut by History*, PBS News (Jan. 3, 2024), https://www.pbs.org/newshour/politics/trumps-vow-to-deport-millions-is-undercut-by-history; Hamed Aleaziz, *Immigrant Arrests Surge to 10,000 in 5 Days as ICE Clamps Down*, N.Y. Times (July 1, 2026), https://www.nytimes.com/2026/07/01/us/politics/ice-immigrant-arrests-surge.html; Albert Sun and Allison McCann, *ICE Arrests Soar as People With No Criminal Record Are Increasingly Targeted*, N.Y. Times (Aug. 27, 2026), https://www.nytimes.com/interactive/2026/08/27/us/ice-immigrant-arrests-trump-deportation-dhs.html (quoting a former ICE official describing how the agency has "'more officers, more money, more detention space, more local partners and better systems,'" allowing it "'to build out this deportation machine'").

35. DHS has acknowledged the need to comply with NEPA and review the environmental impacts of detention facility construction and operation when under its substantial control. In 2021, for example, ICE completed an EA for the El Paso Service Processing Center. The Final EA discussed several opportunities for public involvement including letters sent to stakeholders and a draft EA published on the DHS website. The EA also included a description of the proposed action and three alternatives, including an analysis of the impact that each option would likely have on a broad array of resource areas including: land use, geology, topography and soils, water quality, biological resources, utilities and infrastructure, cultural resources, air quality and climate change, transportation and traffic, noise, aesthetics and visual resources, socioeconomics, environmental justice, and waste management and hazardous materials..[4] Similarly, in 2024, DHS and U.S. Customs and Border Protection completed a Final Supplemental Environmental Assessment regarding a new joint processing center in Laredo, Texas, that described and assessed the potential environmental and socioeconomic impacts of the proposed action.[5]

36. ICE's prior NEPA reviews extended to facilities operated by contractors. In 2016, prior to awarding a contract for the construction, renovation, and operation of a 1,000-bed private detention facility near Houston, Texas, ICE prepared and made public an EA. In it, ICE considered

[4] DHS, ICE, *El Paso Service Processing Center Final Environmental Assessment* (Sep. 15, 2021), https://www.dhs.gov/sites/default/files/publications/ice_el_paso_spc_final_ea_9-27-2021_508compliant.pdf.

[5] DHS, *Final Supplemental Environmental Assessment: Addressing the Proposed Construction, Operation, and Maintenance of a New Joint Processing Center in Laredo, Webb County, Texas* (April 2024), https://www.dhs.gov/archive/publication/final-supplemental-ea-jpc-laredo.

three alternatives and potential impacts on the human environment resulting from awarding the contract and those alternatives..[6]

37. In July 2025, Congress appropriated $45 billion for ICE detention centers as part of the One Big Beautiful Bill Act ("OBBBA"), to remain available until September 30, 2029. Pub. L. No. 119-21, § 90003, 139 Stat. 72, 357–58 (July 4, 2025). Nothing in this appropriation excused ICE from complying with NEPA or any other legal requirement.

38. As recently as August 28, 2026, DHS issued a Request for Proposals ("RFP") soliciting contracts for the provision of comprehensive detention facility services, transportation services, food services, operations and maintenance services, and related support services for ICE detainees in Enforcement and Removal Operations custody, which included the Denver area. Attachment 16 to the RFP provides procedural guidance for complying with NEPA requirements for proposed contract detention facilities and specifies that ICE will be reviewing and compiling information submitted by Offerors to create a Final EA for ICE's proposed contract action. In order to facilitate ICE's NEPA compliance, each Offeror is instructed to submit its own EA to ICE in accordance with an outline provided in the guidance.

## V. Defendants took final action to develop the Big Horn Facility without considering environmental impacts or ensuring appropriate facilities.

39. The town of Hudson, Colorado is located approximately 30 miles northeast of Denver in Weld County. The town's population was 1,651 at the 2020 census.

---

[6] DHS, ICE, *Environmental Assessment for the Proposed Contract Detention Facility in the Houston, Texas Area of Operations* (Dec. 29, 2016), https://www.dhs.gov/sites/default/files/publications/Final%20Houston%20CDF%20EA%2029%20December%202016%20508%20Compliant_1.pdf.

40. The Hudson Correctional Facility is an existing medium security facility located at 3001 Juniper Street, Hudson, Colorado. It was constructed in or around 2008 pursuant to a conditional use permit from the town. From November 2009 to October 2013, the facility was operated as a private prison for the Alaska Department of Corrections. During that time period, it housed a maximum of 871 prisoners. It has remained vacant since that time.

41. On February 14, 2025, DHS published a Request for Information ("RFI"), under Notice ID 2025 ICE-DCR DenverAOR, "to identify possible detention facilities to house noncitizens and immigration violators" within the Denver Field Office area. The RFI indicated it was intended "to obtain market information for planning purposes and to determine appropriate strategies to meet the agency's requirements." Unlike the August 2026 RFP, the RFI does not request information needed for ICE to prepare an EA or otherwise comply with NEPA.

42. In or around February 2025, the Hudson Correctional Facility's owner, Highlands Real Estate Investment Trust ("REIT"), submitted a response to the RFI, proposing to operate the facility as a civil immigration detention center. The response documents list the facility's capacity as 1,256 beds and note the main parking lot has room for approximately 290 spaces, with additional parking in the maintenance-yard lot and service-yard lots. The response documents represent that the facility could accept detainees in a matter of months, and indicate that depending on the planned detainee population and detention standards, modifications to fencing and upgrades to computer systems will be necessary before the facility is operational. Additionally, the response documents state that the Big Horn facility is "expansion-ready" and Highlands REIT had "already received a conditional use permit [in 2009] for a 1,000 bed expansion."

43. On December 1, 2025, ICE awarded a Letter Contract to GEO Group to operate the Big Horn facility as a civil immigration detention center.

44. On July 9, 2026, Highlands REIT entered into a seven-year lease agreement with GEO Group for the facility, with an occupancy date of August 1, 2026.

45. On the same day, ICE awarded a five-year contract to GEO Group to operate the facility as a civil immigration detention center.

46. Section 5.2 of the lease agreement between Highlands REIT and GEO Group specifies that GEO Group is responsible for repairing the property, including "all interior and exterior, structural and nonstructural repairs and replacements to the roof, foundations, exterior walls, building systems, HVAC systems, parking areas, sidewalks, water, sewer and gas connections, pipes and mains."

47. According to federal securities filings, GEO Group does not pay any base rent to Highlands REIT for the first four months of the lease. Following this initial period, GEO Group agrees to pay $250,000 per month in rent for the facility beginning four months after the lease commencement date of August 1, 2026, with the rent increasing to nearly $1 million per month six months after the lease commencement date or as soon as the facility is occupied, whichever occurs first. Thus, the lease appears to contemplate that some renovations or other preparations will be needed before the facility can be occupied by detainees, potentially requiring up to six months of construction.

48. According to GEO Group's second quarter 2026 financial report, ICE will reimburse GEO for the capital expenditures needed to renovate the facility. Additionally, the report

notes that renovations and activation of the Big Horn facility are not expected to be completed until the end of 2026.

49. Upon information and belief, the facility is not currently fit for occupancy, and Defendants have not taken appropriate steps to safeguard public health and the health and safety of detainees. Migrants detained in civil detention facilities are at risk of preventable infections from crowding and limited health care. A recent study published in the Journal of American Medical Association documented 2,035 cases of influenza, 486 cases of hepatitis A, and 252 cases of mumps across 20 ICE facilities between 2019 and 2023.[7] An existing ICE detention facility operated by the GEO Group in Aurora, Colorado recently documented a suspected tuberculosis exposure in a former detainee.[8]

50. Upon information and belief, construction and/or renovation activities are in progress at the facility, and GEO Group has posted a hiring announcement to recruit employees.

51. Defendants did not conduct any public NEPA review process to disclose and analyze potential environmental impacts from construction, renovation, or operation of the facility, and the State is not aware of any finding by Defendants that a categorical exclusion applies to the project.

---

[7] Ribhav Gupta et al., *Epidemiology of 3 Vaccine-Preventable Infectious Diseases Within US Immigration Detention Centers*, JAMA Network Open, 2025 Vol. 8, No. 10, doi:10.1001/jamanetworkopen.2025.44278.

[8] John Daley, *Colorado Issues Public Health Order Over Tuberculosis at Aurora Immigrant Detention Center*, CPR News (Aug. 13, 2026), https://www.cpr.org/2026/08/13/aurora-ice-center-tuberculosis-public-health-order/.

**VI. Defendants' decision to renovate and operate the Big Horn facility as a private immigration detention facility will harm State interests and impact the surrounding environment.**

52. Based on the limited information available about the Big Horn facility, the State has identified a number of potential impacts from Defendants' plans, including impacts that may harm the State's interests. For example, state policy provides that wildlife and their environment are to be protected, preserved, enhanced, and managed for the use, benefit, and enjoyment of the people of Colorado and its visitors. C.R.S. § 33-1-101(1). The General Assembly has also recognized the importance of conserving native species that have been listed as threatened or endangered under state or federal law or are candidate species or are likely to become candidate species. C.R.S. § 24-33-111(1). In addition, in order to foster the health, welfare, convenience, and comfort of Colorado's residents and to facilitate the enjoyment and use of the scenic and natural resources of the state, state policy strives to achieve the maximum practical degree of air purity in every portion of the state, to attain and maintain the national ambient air quality standards, and to prevent the significant deterioration of air quality in those portions of the state where the air quality is better than the national ambient air quality standards. C.R.S. § 25-7-102(1).

53. NEPA protects these interests by ensuring "federal agencies are informed of environmental consequences before making decisions." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970–71 (9th Cir. 2003) (citation omitted). NEPA review can also identify needed permits and assist permitting agencies in their consideration of any permit applications. Precluding "the kind of public comment and participation NEPA requires" harms Colorado by increasing the risk of an uninformed decision that causes environmental harm. *Id.* at 971.

Defendants were obligated to consider these and other interests before taking final action to issue contracts to renovate and operate the facility as a civil immigration detention center.

54. **Wildlife & habitat.** Colorado has an interest in protecting its wildlife and their habitat. *See Crow Indian Tribe v. United States*, 965 F.3d 662, 677 (9th Cir. 2020) ("states have an interest in conservation and protection of wild animals"); C.R.S. § 33-1-101(1). ("It is the policy of the state of Colorado that the wildlife and their environment are to be protected, preserved, enhanced, and managed for the use, benefit, and enjoyment of the people of this state and its visitors."). The Big Horn facility is in vicinity of at least two High-Priority Habitats ("HPHs") designated by Colorado Parks and Wildlife ("CPW").

- A Mule Deer Migration Corridor is located within 0.5 miles of the facility. Increased traffic in the area and nighttime lighting at the facility could impact this corridor.
- A designated Aquatic Native Species Conservation Water (water bodies identified as requiring conservation measures for native aquatic species) is located less than one mile away from the facility, in Box Elder Creek. Run-off from construction activities and ongoing operations and increased sediment from disturbed earth and vegetation removal could impact this habitat.

55. There are multiple species identified as in need of conservation that are known to inhabit areas in vicinity of the facility. Further, the federal government's own information indicates the possibility of federally protected species in vicinity of the facility. Yet, as a consequence of the apparent lack of NEPA review, the State has no information indicating Defendants have consulted with the U.S. Fish and Wildlife Service under Section 7 of the Endangered Species Act or determined consultation is unnecessary.

56. For example, there are likely black-tailed prairie dogs in the vicinity of the facility. Black-tailed prairie dogs are a Tier 2 species of greatest conservation need, and their presence suggests burrowing owls may also be in the area. Burrowing owls, which often nest in prairie dog colonies, are a Tier 2 species of greatest conservation need,[9] a state-threatened species, and protected by the Migratory Bird Treaty Act.

57. Additionally, the Northern Leopard Frog, a Tier 1 SGCN, and Cassin's sparrow, protected by state law and the Migratory Bird Treaty Act, have been documented to occur within one mile of the facility.

58. Finally, the facility is within the overall range of the Preble's Meadow Jumping Mouse, a Tier 1 species of greatest conservation need designated threatened under state law and the federal Endangered Species Act.

59. Upon information and belief, activities needed for the renovation and operation of the facility as a civil immigration detention center have the potential to impact these wildlife and ecological resources, and they should have been analyzed and considered by the Defendants prior to taking final agency action.

60. **Air quality.** The State also has a sovereign interest in maintaining air quality. "States bear 'primary responsibility' for developing plans to achieve air-quality goals." *Ohio v.*

---

[9] States develop State Wildlife Action Plans ("SWAPs") under the State and Tribal Wildlife Grants program. To qualify for federal funding, states must create and submit a SWAP to the U.S. Fish and Wildlife Service. Plans must be approved and revised at least every 10 years. The Species of Greatest Conservation Need ("SGCN") list is the centerpiece of the SWAP, and identifies species within the state that most urgently need conservation action. Tier 1 Species are identified as needing conservation interventions most urgently. Tier 2 Species are in less danger but still need active conservation.

*EPA*, 603 U.S. 279, 283 (2024) (citing 42 U.S.C. § 7401(a)(3)). The facility is located within the Denver Metropolitan/North Front Range nonattainment region for ozone, which includes Weld County. Ground-level ozone is a harmful air pollutant and a major component of smog. Short-term exposure to unhealthy levels of ozone pollution can cause symptoms, such as coughing; eye, nose, and throat irritation; chest pains; breathing difficulty; and more frequent asthma attacks. Long-term exposure to ozone is linked to a variety of poor health outcomes, including lung and cardiovascular disease and premature death.

61. Modifications to the facility and changes to its operations may impact the State's duties and obligations under the Clean Air Act with respect to attainment of National Ambient Air Quality Standards for ozone and other pollutants in the region covering the facility. These impacts must be identified, analyzed, and mitigated through the public NEPA process and consultation with the State. Emissions at the facility may increase if the renovations involve, for instance, installing an industrial boiler, backup generator, or other pollution-emitting equipment at the facility. Renewing operations with existing equipment that has not been operational for several years could also increase overall emissions. Similarly, increased traffic to and from the facility could adversely impact air quality.

62. **Roadway infrastructure & traffic.** The roads leading to and from the facility include Juniper Street and County Road 47, which are both partially paved, partially dirt two-lane roads. Operating the Big Horn facility as a 1,200-bed detention center will have an impact on traffic, including on nearby State highways. Defendants have not provided sufficient details regarding expected traffic impacts to know whether local roads and State highways can accommodate the increase in traffic that would be needed to move detainees to and from the

facility, or whether any state or federal permits are needed for improvements to support the project. Nor have Defendants provided even an estimate of the number of car trips to and from the facility from friends, family, and legal counsel exercising their rights to visit detainees. Finally, Defendants have not provided any indication of whether they anticipate having to close roads in the area to accommodate construction at the facility.

63. **Water & wastewater resources & infrastructure.** The town of Hudson recently published its Water Supply Master Plan[10] and Wastewater Utility Plan[11] that detail infrastructure improvements that would need to take place if the former Hudson Correctional Facility were to become operational again.

64. To address increased water demands from the reopening of the facility, the Water Supply Master Plan recommends expanding the town's reverse-osmosis drinking water treatment plant and fully automating the expanded plant. In addition, an additional well would need to be added to the town's water supply to support the facility once it reaches full capacity. There is no indication in the public record that Defendants considered the water resource impacts of their decision prior to entering into a contract to renovate and operate the facility.

65. Next, reopening the facility will impact the town's wastewater treatment plant. Even without the additional population at the facility, the town's peak flows at the wastewater treatment plant are already consistently exceeding the plant's current capacity, requiring upgrades

---

[10] Clear Water Solutions, Town of Hudson, *2026 Water Supply Master Plan* (2026), https://hudsonco.gov/DocumentCenter/View/6468/Hudson-Water-Supply-Master-Plan.

[11] EPS Grp., Town of Hudson, *Wastewater Utility Plan for Town of Hudson* (Apr. 1, 2026), https://hudsonco.gov/DocumentCenter/View/6554/Wastewater-Master-Plan-Report.

that will depend on the pace, sequencing, and characteristics of various developments anticipated in the plant's service area. Reopening of the facility is expected to accelerate the need for wastewater treatment upgrades.

66. According to the town's Wastewater Master Plan, the historic maximum prisoner population at the Hudson Correctional Facility was 871, but the prison was constructed for a maximum capacity of 1,250 prisoners. Assuming the historical capacity of 871 prisoners, the town projects that the facility will add an additional 0.075 million gallons per day ("MGD") to the existing wastewater flowrate. At maximum capacity, the town projects that the facility will add an additional 0.108 MGD to the existing wastewater flowrate.

67. The Big Horn facility is likely to be considered an industrial facility subject to the Clean Water Act's industrial pretreatment program, which requires pretreatment of the facility's wastewater prior to discharging it to the town's domestic wastewater treatment system. According to the town's Wastewater Master Plan, the facility was previously subject to pretreatment requirements when it operated as a private prison, because of the amount and type of contraband, chemicals, drugs, and other harmful substances present at the facility.

68. The GEO Group's past operation of the Hudson Correctional Facility resulted in violations of EPA's industrial pretreatment requirements. *See* Combined Complaint and Consent Agreement, *In the Matter of The GEO Group, Inc., Hudson Correctional Facility*, EPA Docket No. CWA-08-2014-0025 (Aug. 5, 2014). The facility discharged oil and grease to the town's wastewater treatment plant at levels that interfered with treatment processes, leading to effluent discharges containing pollutants in excess of the town's discharge permit limits. As a result of these violations, the GEO Group agreed to pay a civil penalty of $6,250 and complete a

Supplemental Environmental Project to provide equipment to the town to improve its wastewater treatment capabilities.

69. As described in the town's Wastewater Master Plan, since the facility last operated in 2013, the Colorado Department of Public Health and Environment ("CDPHE") has issued more stringent effluent limits in the discharge permit for the town's wastewater treatment plant, and pretreatment would assist the town in complying with its permit. Notably, the town's wastewater treatment plant discharges to Box Elder Creek, a state-designated Aquatic Native Species Conservation Water. There is no indication in the public record that Defendants considered the wastewater treatment impacts of their decision or evaluated the need for pretreatment prior to entering into a contract to renovate and operate the facility.

70. **Public health & safety.** Finally, the State has an interest in protecting the public health, safety, and welfare of its residents. The State expects the Hudson facility to place additional burdens on essential public services in light of public reporting of conditions in detention facilities around the country revealing evidence of tuberculosis, measles outbreaks, sewage problems, and other unsanitary conditions, as well as the significant increase in population that would be housed in this rural community if the facility is operated at full capacity.[12] In addition, the plan to renovate

---

[12] Tom Dreisbach, *Government's Own Experts Found 'Barbaric' and 'Negligent' Conditions in ICE Detention*, NPR News (Aug. 16, 2023), https://www.npr.org/2023/08/16/1190767610/ice-detention-immigration-government-inspectors-barbaric-negligent-conditions (detailing reports of medical neglect and living conditions that made facilities unsafe for occupancy; systemic reports of overcrowding and poor cleaning practices); McKenna Mobley, *Judge Orders Immediate Changes at Adelanto ICE Detention Center*, USA Today (July 23, 2026), https://www.usatoday.com/story/news/state/california/2026/07/22/judge-orders-improvements-at-adelanto-ice-detention-center/91016440007 (detailing court ruling that found conditions at the Adelanto detention facility, also run by GEO Group, are likely unconstitutional. Court filings show

and reopen the facility is controversial, and has drawn public protest and litigation.[13] State and local law enforcement presence could be required to respond to future protest activity. There is no indication in the public record that Defendants considered the public health and safety impacts of their decision prior to entering into a contract to renovate and operate the facility, or that they took any steps to ensure the facility meets health and safety requirements sufficient to ensure appropriate detention conditions within the meaning of 8 U.S.C. § 1231(g)(1).

## CAUSES OF ACTION

## COUNT I

### Violation of NEPA, 42 U.S.C. § 4321, et seq.
### APA, 5 U.S.C. § 706(2)
### Action that is Contrary to Law

71. The State realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this complaint.

72. Under the APA, a Court must "hold unlawful and set aside agency action" that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short

detainees often go weeks without receiving medication or treatment, in addition to spoiled food, poor water quality, and mold inside housing units); Daniella Silva, *Problems at ICE Facility Include Guard who Lost Loaded Weapon, Failure to Test for Tuberculosis, Report Says*, NBC News (June 9, 2026) https://www.nbcnews.com/news/us-news/-ice-camp-east-montana-gao-report-tuberculosis-guard-lost-gun-rcna349213 (detailing Government Accountability Office (GAO) report that found detention center failed to test for tuberculosis, failed to provide treatment to detainees with chronic conditions, and overall neglect contributing to a measles outbreak).

[13] Colleen Slevin, *People Urge Hudson Town Leaders to Fight Immigration Detention Center*, The Colorado Sun (July 16, 2026), https://coloradosun.com/2026/07/16/people-urge-hudson-town-leaders-to-fight-ice-detention-center; Ava Kian, *Town of Hudson Faces Lawsuit Over ICE Detention Facility*, CPR News (July 23, 2026), https://www.cpr.org/2026/07/23/hudson-ice-center-lawsuit.

of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

73. Each of the Defendants is an "agency" as defined in 5 U.S.C. § 551(1).

74. NEPA claims are subject to judicial review under the APA. *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1029 (10th Cir. 2023); *see also Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir. 1996) (explaining that the "alleged failure to comply with NEPA constitutes 'final agency action'" if the agency determines that it was "not required to comply").

75. Compliance with NEPA is required if the federal government's involvement in a project constitutes a "major federal action." *Ross v. Fed. Highway Admin.*, 162 F.3d 1046, 1051 (10th Cir. 1998); 42 U.S.C. § 4332(2)(C). A major federal action is defined broadly as "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A). According to DHS internal policies, "NEPA generally applies to actions to be undertaken, funded, permitted, or otherwise approved by DHS, including activities that may be wholly initiated within DHS, [or] executed by DHS under the direction of Congress." DHS Instruction Manual at III-1.

76. Renovation and operation of a civil immigration detention center by a government contractor is "subject to substantial federal control and responsibility," such that it qualifies as a major federal action subject to NEPA. This "major federal action" is under Defendants' substantial direction and control. 42 U.S.C. § 4336e(10)(A).

77. Defendants' decision to enter into a contract with GEO Group to renovate and operate the Big Horn facility as an immigration detention facility constitutes final agency action reviewable under the APA.

78. The decision to enter into a contract with GEO Group to renovate and operate an immigration detention center is a major Federal action.

79. This major Federal action will have reasonably foreseeable impacts on the human environment.

80. NEPA requires federal agencies to prepare an environmental impact statement for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The environmental impact statement must discuss "reasonably foreseeable environmental effects." *Id.* § 4332(2)(C)(i).

81. "[U]nless the agency finds that the proposed agency action is excluded pursuant to one of the agency's categorical exclusions[,]" it may prepare an environmental assessment (EA) if a project does not have "reasonably foreseeable significant effect[s]" on the environment or if "the significance of such effect[s] is unknown,". 42 U.S.C. § 4336(b)(2). Such an EA must "concise[ly]" set forth the agency's reasons for finding no significant environmental effects. *Id.*

82. To the State's knowledge, Defendants have prepared neither an EIS nor an EA with respect to the contract with GEO Group to renovate and operate the Big Horn facility.

83. To the State's knowledge, Defendants have not invoked any categorical exclusion that could properly excuse ICE from reviewing its contract with GEO Group to renovate and operate the Big Horn facility under NEPA.

84. Defendants failed to take the required "hard look" at the environmental consequences of the renovation and operation of the facility prior to taking final action, in violation of NEPA. *See WildEarth Guardians v. U.S. Forest Service*, 137 F.4th 1068, 1082–83 (10th Cir. 2025).

85. Failure to conduct the required environmental review under NEPA violates the law and deprives the State of the procedure to which it is entitled by law.

86. The Court should vacate and set aside Defendants' contract with the GEO Group, enjoin further work on the facility, including further renovations or construction needed to make the facility operable as a civil immigration detention center, and remand the matter to the agency to prepare an environmental assessment or environmental impact statement.

**COUNT II**

**Violation of the Administrative Procedure Act**
**Action that is Arbitrary and Capricious (5 U.S.C. § 706)**

87. The State realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this complaint.

88. The APA requires courts to "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.§ 706(2)(A).

89. Each of the Defendants is an "agency" as defined in 5 U.S.C. § 551(1).

90. Defendants' decision to enter into a contract with GEO Group to renovate and operate the Big Horn facility as an immigration detention facility constitutes final agency action reviewable under the APA.

91. Defendants' decision to forgo any environmental review of the renovation and operation of the Big Horn facility is arbitrary and capricious. Defendants have not offered any explanation—let alone "a satisfactory explanation"—for their action, and have not provided "a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

92. Nor have Defendants given any explanation—let alone a reasoned explanation—for their change in previous position that NEPA review is required for projects that involve the renovation and operation of immigration detention and processing centers.

93. DHS has previously conducted environmental assessments pursuant to NEPA for renovations of both ICE-owned and contract detention facilities.

94. Defendants also failed to consider important aspects of the problem, including the immediate impact that this decision will have on public health and safety, and the long-term impact of the agency's decision to enter into a long-term contract to operate a detention facility in a rural area.

95. The Court should vacate and set aside Defendants' contract with the GEO Group, enjoin further work on the facility, including further renovations or construction needed to make the facility operable as a civil immigration detention center, and remand the matter to the agencies to prepare an environmental assessment or environmental impact statement.

## COUNT III

### Violation of the Administrative Procedure Act
### Action that is Contrary to Law (INA, 8 U.S.C. § 1231(g)(1))

96. The State realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this complaint.

97. Under the APA, a Court must "hold unlawful and set aside agency action" that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

98. Each of the Defendants is an "agency" as defined in 5 U.S.C. § 551(1).

99. Defendants' decision to enter into a contract with GEO Group to renovate and operate the Big Horn facility as an immigration detention facility constitutes final agency action reviewable under the APA.

100. The INA requires Defendants to "arrange for appropriate places of detention" for individuals "detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1).

101. Upon information and belief, Defendants have failed to satisfy their obligation to ensure that the Big Horn facility is "appropriate" for detention. Although the facility previously served as a private corrections facility over a decade ago, it is not appropriate for detention today.

102. Hudson's planning documents indicate that the town's current drinking water supply would be strained by the conversion of the facility and that further drinking water treatment infrastructure will likely be needed. Similarly, the town's wastewater treatment and facilities will likely need to be expanded. The area's limited drinking water and wastewater resources and the

uncertainty as to whether infrastructure upgrades will be required make the facility inappropriate for use as a detention facility.

103. Additionally, the facility is inappropriate for use as a detention facility because the limited local road infrastructure is insufficient to support the anticipated traffic volumes created by the facility. Similarly, the town's limited public safety resources are insufficient to support the anticipated needs of a large-scale immigration detention facility and would likely be overburdened.

104. Because Defendants' decision to convert the facility into a civil immigration detention facility failed to ensure that it is "appropriate" for detention, it violates the INA and is thus contrary to law under the APA.

105. The Court should vacate and set aside that decision and enjoin any further implementation until Defendants comply with their requirements under the INA.

## PRAYER FOR RELIEF

WHEREFORE, the State respectfully requests that the Court:

a. Declare that Defendants' decision to enter into a contract for the renovation, operation, and use as a civil immigration detention facility of the Big Horn facility without first preparing an environmental assessment or environmental impact statement or documenting its reliance on a categorical exclusion is contrary to law, in excess of statutory authority, without observance of procedure required by law, and is arbitrary and capricious, and therefore is in violation of the APA;

b. Declare that Defendants' decision to enter into a contract for the renovation, operation, and use of the Big Horn facility an immigration detention facility without first ensuring to "arrange" that the Big Horn facility is an "appropriate" place of detention pursuant to 8 U.S.C. § 1231(g)(1), is contrary to law, in excess of statutory authority, without observance of procedure required by law, and is arbitrary and capricious, and therefore is in violation of the APA;

c. Preliminarily and permanently enjoin Defendants from further implementing their decision to enter into a contract for the renovation and operation of the Hudson facility as an immigration detention facility until all requirements under NEPA and

INA have been satisfied, and require them to provide notice of any injunction to all agency officers, agents, servants, employees and attorneys, and to all other persons who are in active concert or participation with the Defendants to implement the contract, including the GEO Group and any other contractors or subcontractors responsible for conducting work at the site;

d. Vacate and set aside Defendants' decision to enter into a contract for the renovation and operation of the Hudson facility and stay further implementation of that decision;

e. Remand the matter to the agency to comply with NEPA and the INA; and

f. Grant such relief as this Court may deem proper.

Dated: September 29, 2026

Respectfully submitted,

**PHILIP J. WEISER**
Attorney General of Colorado

*/s/ Carrie Noteboom*
***Carrie Noteboom***
Assistan Deputy Attorney General
***Sarah H. Weiss***
Senior Assistant Attorney General
***Sam Wolter***
Assistant Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Carrie.Noteboom@coag.gov
Sarah.Weiss@coag.gov
Samuel.Wolter@coag.gov
*Attorneys for plaintiff State of Colorado*