**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 26-cv-04832

THE STATE OF COLORADO,

Plaintiff,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,
DAVID J. VENTURELLA, in his official capacity as Senior Official performing the duties of the Director of Immigration and Customs Enforcement,

Defendants.

---

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

The State of Colorado seeks a preliminary injunction to halt the continued renovation, construction, and planned operation of a new civil immigration detention center in Hudson, Colorado until the U.S. Department of Homeland Security ("DHS") and U.S. Immigration and Customs Enforcement ("ICE") complete the required environmental review under the National Environmental Policy Act ("NEPA"). Without an injunction, construction, renovation and operation of the facility threaten imminent irreparable environmental harm. DHS and ICE have violated NEPA by contracting for the facility's operation without considering the potential environmental impacts. This Court should preliminarily enjoin the renovation, construction, and operation of the facility until Defendants complete the required environmental review.

Plaintiff's counsel notified the U.S. Attorney's Office for the District of Colorado by email on September 28, 2026, that Colorado would be filing the complaint and this motion. Upon filing,

Colorado will provide courtesy copies of all pleadings to the U.S. Attorney's Office by email and will effectuate service as soon as summonses are issued.

**FACTUAL BACKGROUND**

On July 9, 2026, DHS and ICE entered a five-year contract valued at over $500 million with a private corporation, the GEO Group, Inc., to renovate and operate an approximately 1,200-bed private immigration detention facility, known as the Big Horn facility. The Big Horn facility would occupy the site of a long-dormant private prison in Hudson, Colorado, the medium security Hudson Correctional Facility that last operated in 2013. The contract appears to be part of DHS's effort to substantially increase its detention capacity as part of an overall administration policy to carry out the "largest domestic deportation operation in American history."[1]

The contract follows DHS outreach seeking information on available detention capacity. On February 14, 2025, DHS published a Request for Information ("RFI") "to identify possible detention facilities to house noncitizens and immigration violators" within the Denver Field Office area. Ex. 1 to Declaration of Carrie Noteboom ("Noteboom Decl."). The RFI was intended only "to obtain market information for planning purposes and to determine appropriate strategies to meet the agency's requirements." Noteboom Decl. Ex. 1. On February 21, 2025, the facility's owner, Highlands Real Estate Investment Trust ("Highlands REIT"), proposed the facility as a civil immigration detention center. Noteboom Decl. Ex. 2. The response lists the facility's capacity

[1] Lisa Mascaro, *Trump's Big Bill is Powering his Mass Deportations. Congress is Starting to Ask Questions*, A.P. News (Aug. 11, 2025), https://apnews.com/article/trump-congress-deportations-immigration-raids-homeland-security-a2c6a2f726629e62bd0199aee68294f6; Hamed Aleaziz, *Immigrant Arrests Surge to 10,000 in 5 Days as ICE Clamps Down*, N.Y. Times (July 1, 2026), https://www.nytimes.com/2026/07/01/us/politics/ice-immigrant-arrests-surge.html.

as 1,256 beds, noting the facility is "expansion-ready" with the possibility to add 1,000 beds; the main parking lot has room for approximately 290 spaces. Noteboom Decl. Ex. 2 at 2.

On December 1, 2025, ICE awarded a letter contract to GEO Group for comprehensive detention services at the facility. Noteboom Decl. Ex. 3 at 8. In July 2026, Highlands REIT entered into a seven-year lease agreement with GEO Group for the Big Horn facility. Noteboom Decl. Ex 4. Under the lease, GEO Group assumed responsibility for all necessary repairs including "all interior and exterior, structural and nonstructural repairs and replacements to the roof, foundations, exterior walls, building systems, HVAC systems, parking areas, sidewalks, water, sewer and gas connections, pipes and mains." Noteboom Decl. Ex. 4 at Section 5.2. The same day the lease was executed, GEO announced a five-year contract with ICE to operate the facility. Noteboom Decl. Ex. 5. According to GEO Group's second quarter 2026 financial report, ICE will reimburse GEO for the capital expenditures needed to renovate the facility, and renovations are expected to last through the end of 2026. Noteboom Decl. Ex. 6. at 3.

Defendants did not conduct any public process to review potential environmental impacts from their decision, and Colorado is not aware of any finding that the action does not require environmental review. The facility threatens several harmful impacts on the surrounding community and environment: impacts on protected and sensitive species; habitat disruption; air quality impacts from facility emissions and associated traffic and construction; and impacts to local drinking water supplies and wastewater treatment. *See* Section II, *infra*.

## LEGAL STANDARD

A party seeking a preliminary injunction must establish: "(1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the

balance of equities tips in their favor, and (4) an injunction is in the public interest." *M.G. ex rel. Garcia v. Armijo*, 117 F.4th 1230, 1238 (10th Cir. 2024) (citation modified). The first two factors are the most important. *Nken v. Holder*, 556 U.S. 418, 434 (2009). And the third and fourth factors "merge" where, as here, the United States is the opposing party. *Id.* at 435. Because NEPA does not contain its own judicial review provision, courts review an agency's compliance with NEPA under the Administrative Procedures Act ("APA"). *DinéCitizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1029 (10th Cir. 2023).

## ARGUMENT

### I. Colorado is likely to succeed on the merits of its NEPA claims.

NEPA requires all federal agencies to take a hard look at the environmental impacts of their proposed actions, and inform the public of those impacts, before deciding whether and how to proceed. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Rocky Mountain Wild v. Dallas*, 98 F.4th 1263, 1293 (10th Cir. 2024). By requiring this advance review, NEPA is intended to "inform agency decisionmaking," *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 173 (2025). Before committing to the action, agencies must analyze environmental impacts, feasible mitigations, and lesser-impact alternatives to a proposed action in an environmental impact statement ("EIS") or environmental assessment ("EA") and make the document publicly available for review and comment. 42 U.S.C. §§ 4336(b), 4332(2)(C).

#### A. Defendants' decision to contract for operation of the Big Horn facility is a major federal action subject to NEPA.

A "major Federal action" is "an action that the agency . . . determines is subject to substantial federal control and responsibility." 42 U.S.C. § 4336e(10)(A). "Although there is no

litmus test for whether something qualifies," courts generally focus on the level of federal funding and agency authority over an action. *See Indian River County v. Rogoff*, 201 F. Supp. 3d 1, 15 (D.D.C. 2016). Whether a project is a major federal action turns on whether "the federal government has actual power to control" it. *Rocky Mountain Wild*, 98 at 1297 (citation omitted).

Here, Defendants' decision to enter a five-year contract with GEO Group to provide immigration detention services at the Big Horn facility readily qualifies as a major federal action. NEPA applies to federal agencies even when they act through contracts. *Citizens Advisory Comm. on Priv. Prisons, Inc. v. U.S. Dep't of Just.*, 197 F. Supp. 2d 226, 246 (W.D. Pa. 2001), *aff'd*, 33 F. App'x 36 (3d Cir. 2002) ("[I]f [an agency] can shed its obligations under NEPA by giving major federal projects to private contractors, NEPA's requirements would ring hollow indeed."); *see also United States v. S. Fla. Water Mgmt. Dist.*, 28 F.3d 1563, 1572 (11th Cir. 1994). ("Major federal action can exist when the primary actors are not federal agencies."). Defendants have directed the project at least since they began soliciting information for "possible detention facilities" to house criminal aliens within the Denver metro area. Noteboom Decl. Ex. 1 at 1. ICE has not only executed a contract with the GEO Group to operate the facility, but also agreed to reimburse all capital expenditures required to renovate and maintain the facility. Noteboom Decl. Ex. 6. Defendants plainly control the Big Horn project by funding renovations and contracting for the facility's operation to carry out the agencies' civil immigration detention function. *See Sierra Club v. U.S. Dep't of Agric.*, 777 F. Supp. 2d 44, 60 (D.D.C. 2011) ("[F]ederal funding is a significant indication that a project constitutes a major federal action." (citation omitted)).

Defendants' decision was final at least when they entered into a contract with the GEO Group in July 2026, *see Hamrick v. GSA*, 107 F. Supp. 3d 910, 926 (C.D. Ill. 2015) (finding the

GSA's entrance into contract with private entity to be a major federal action), and potentially as early as December 2025 when they executed a letter contract for comprehensive detention services at the Big Horn facility. Noteboom Decl. Ex. 3. And the initiation of construction activities and job postings[2] to recruit employees indicate the project has moved well past a final decision and into active implementation. *See Citizens Advisory Comm.*, 197 F. Supp. 2d at 242 (concluding that agency violated NEPA when it awarded a contract to a private entity and allowed construction on the project to proceed without first conducting environmental review). Defendants were required to prepare either an EIS or EA to examine the potential environmental impacts of their planned course of action prior to making a final decision. 42 U.S.C. § 4336(b)(1)–(2). Yet they did neither, violating their obligations under NEPA.[3]

[2] *Jobs*, The GEO Grp., https://jobs.geogroup.com/working-at-geo/jobs?stretchUnit=MILES&stretch=10&location=hudson,%20co&limit=100&page=1 (last visited Sep. 29, 2026).

[3] An agency may avoid preparing an EIS or EA for a proposed major federal action only in the limited circumstances where: (1) the proposed action would not constitute "final agency action" under the APA; (2) the proposed action is subject to a valid categorical exclusion, meaning that it falls into a category of actions that an agency has determined normally does not significantly affect the quality of the environment; (3) preparation of an environmental review document would "clearly and fundamentally conflict with the requirements of another provision of law," or, (4) the proposed action is nondiscretionary such that the agency cannot consider environmental factors when reaching a final decision. 42 U.S.C. § 4336(a)(1)–(4). None of these exceptions apply. First, the decision to enter into a multiyear contract to renovate and operate a civil immigration detention facility is clearly final agency action. Second, pursuant to DHS's own procedures, the presence of "extraordinary circumstances" that might give rise to significant environmental effects requiring further analysis and documentation in an EA or EIS prevents Defendants from relying on a categorical exclusion. Third, there are no conflicting provisions of law. *See* Noteboom Decl. Ex. 7 at IV-9 ("DHS Instruction Manual") ("There is no national security or homeland security exemption from complying with NEPA."). And fourth, procuring a vendor to provide detention services is discretionary.

**B. The renovation, construction and operation of the Big Horn facility may have environmental impacts that Defendants are obligated to consider.**

Federal agencies must prepare an EIS if the proposed action "has a reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. § 4336(b)(1). If the proposed action does not have such effect or significance of the effect is unknown, the agency must prepare an EA or identify an applicable categorical exclusion. *Id.* § 4336(b)(2).

Here, although Defendants' failure to provide the public with any detailed information about their plans makes it impossible to fully assess the scope of possible environmental harms, Colorado has identified several potential impacts that the agencies must review. First, multiple species in need of conservation are known to inhabit areas near the facility, including black-tailed prairie dogs, burrowing owls, northern leopard frogs, and Cassin's sparrows. The facility is also located within the overall range of the Preble's meadow jumping mouse, designated as threatened under state and federal law. Declaration of Shannon Schaller ¶ 12 ("Schaller Decl."). Renovation and operation of the facility may impact these wildlife and ecological resources, *id.*, and should have been considered prior to taking final action. *See DinéCitizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 854 (10th Cir. 2019) (explaining that "the purpose of NEPA" is "to require federal agencies to analyze environmental consequences *before* initiating actions that potentially affect the environment" (citation modified, emphasis added)).

In addition, the Big Horn facility is near at least two High-Priority Habitats ("HPHs") designated by Colorado Parks and Wildlife: a Mule Deer Migration Corridor, and a designated Aquatic Native Species Conservation Water located less than one mile away in Box Elder Creek. The migration corridor may be impacted by increased traffic in the area and nighttime lighting at

the facility, while runoff from construction and soil disturbance at the site could impact aquatic habitat. Schaller Decl. ¶ 14.

Next, the facility is located within the Denver Metropolitan/North Front Range nonattainment region for ozone. *See* Noteboom Decl. Ex. 11. Short-term exposure to unhealthy levels of ozone pollution can cause coughing; eye, nose, and throat irritation; chest pains; breathing difficulty; and more frequent asthma attacks. Long-term exposure to ozone is linked to a variety of poor health outcomes, including lung and cardiovascular disease and premature death.[4] Modifications to the facility and its operations may increase air emissions and impact the State's obligations under the Clean Air Act with respect to attainment of National Ambient Air Quality Standards for ozone and other pollutants in the region covering the facility.[5]

Reopening the facility to house upwards of 1,200 detainees will also strain local drinking water supplies and wastewater treatment infrastructure. A town planning document recommends expanding the town's drinking water treatment plant and drilling an additional well to address increased water demands from the reopening of the facility.[6] Similarly, the additional flows to the

---

[4] *Ozone Pollution and Your Health*, Colo. Dep't of Pub. Health and Env't, https://cdphe.colorado.gov/ozone-pollution-and-your-health (last visited Sep. 29, 2026).

[5] *See Federal Ozone Pollution Standards and Colorado Nonattainment Areas*, Colo. Dep't of Pub. Health and Env't, https://cdphe.colorado.gov/apcd/nonattainment-federal-ozone-pollution-standards (last visited Sep. 29, 2026) ("Vehicles that run on gas, other equipment that runs on gas or other fossil fuels, and industry operations are all large sources of ozone precursors in Colorado.")

[6] Clear Water Solutions, Town of Hudson, *2026 Water Supply Master Plan*, ES-1–ES-2, 17, 32 (2026), https://hudsonco.gov/DocumentCenter/View/6468/Hudson-Water-Supply-Master-Plan.

town's wastewater treatment plant from facility operations could require upgrades.[7] The GEO Group's past operations of the facility resulted in violations of EPA's industrial pretreatment requirements from discharges of oil and grease that interfered with wastewater treatment processes and caused the town to exceed its discharge permit limits. Noteboom Decl. Ex. 8.

The facility may also place additional burdens on essential public services in light of public reporting of conditions in detention facilities around the country revealing evidence of tuberculosis, measles outbreaks, sewage problems, and other unsanitary conditions. A recent study documented 2,035 cases of influenza, 486 cases of hepatitis A, and 252 cases of mumps across 20 ICE facilities between 2019 and 2023.[8] An existing ICE detention facility operated by the GEO Group in Aurora, Colorado recently documented a suspected tuberculosis exposure.[9]

These are exactly the sort of consequences that the "hard look" required by NEPA is meant to address. *Robertson*, 490 U.S. at 350. And the harms could be even more far-reaching, as without an EIS or EA, Colorado and the public cannot know the full extent of the environmental harm that the Big Horn facility presents. *See Winter*, 555 U.S. at 23 ("Part of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures.").

---

[7] EPS Grp., Town of Hudson, *Wastewater Utility Plan for Town of Hudson* (Apr. 1, 2026), https://hudsonco.gov/DocumentCenter/View/6554/Wastewater-Master-Plan-Report.

[8] Ribhav Gupta et al., *Epidemiology of 3 Vaccine-Preventable Infectious Diseases Within US Immigration Detention Centers*, JAMA Network Open, 2025 Vol. 8, No. 10, doi:10.1001/jamanetworkopen.2025.44278.

[9] John Daley, *Colorado Issues Public Health Order Over Tuberculosis at Aurora Immigrant Detention Center*, CPR News (Aug. 13, 2026), https://www.cpr.org/2026/08/13/aurora-ice-center-tuberculosis-public-health-order/.

**C. Defendants' failure to conduct an environmental review contravenes their own guidance and past practice and is arbitrary and capricious.**

While NEPA provides general statutory directions, actual implementation falls on the agencies themselves. DHS has published its own instruction manual to guide its NEPA process. Noteboom Decl. Ex. 7. The DHS Instruction Manual emphasizes that "NEPA applies to the majority of DHS actions . . . . Examples of situations in which NEPA is not triggered are very few." DHS Instruction Manual at V-1. The Manual clarifies that "NEPA generally applies to actions to be undertaken, funded, permitted, or otherwise approved by DHS," *id*. at III-1, and that environmental effects to be considered include "ecological (such as the effects on natural resources …), aesthetic, historic, cultural, economic, social, or health" effects, *id*. at II-2. The Manual emphasizes the importance of a public, transparent NEPA process, instructing components to "make diligent efforts to ensure that potentially interested parties are identified and notified and have an opportunity to provide input in a manner that could have a practical influence on proposed DHS actions before decisions are made," and directs that collaboration with various stakeholders, including State agencies, "is an effective way to identify environmental issues that need to be considered in DHS planning and decision-making." *Id*. at IV-6.

Defendants have previously adhered to this guidance and conducted NEPA review for both ICE-owned and Contract Detention Facilities ("CDFs").[10] And as recently as August 28, 2026,

---

[10] *See* DHS, ICE, *Environmental Assessment for the Proposed Contract Detention Facility in the Houston, Texas Area of Operations* (Dec. 29, 2016), https://www.dhs.gov/sites/default/files/publications/Final%20Houston%20CDF%20EA%2029%20December%202016%20508%20Compliant_1.pdf.; DHS, *Final Supplemental Environmental Assessment: Addressing the Proposed Construction, Operation, and Maintenance of a New Joint Processing Center in Laredo, Webb County, Texas* (April 2024), https://www.dhs.gov/archive/publication/final-supplemental-ea-jpc-laredo; DHS, ICE, *El Paso Service Processing Center Final Environmental Assessment* (Sep. 15,

Defendant DHS issued a Request for Proposal ("RFP") soliciting contracts for the provision of comprehensive detention facility services, transportation services, food services, operations and maintenance services, and related support services for ICE detainees, which included the Denver area. Noteboom Decl. Ex. 9. The RFP requires Offerors to submit "information to support the Government's NEPA review" with their proposal, regardless of the status of the facility, and the evaluation criteria for the selection process include "[w]hether the submission is sufficiently complete and credible to support the Government's NEPA review and schedule." *Id*. at 126. An attachment provides further instructions on how to prepare and submit NEPA materials and states that ICE will use those submissions to compile a Final Environmental Assessment for the agency's proposed contract action. Noteboom Decl. Ex. 10 at 1.

Despite the clear instructions of their own guidance and procurement documents and their established practice of conducting environmental reviews to analyze impacts of detention facilities, Defendants simply ignored this legal obligation here, entering into the contract with the GEO Group to operate the Big Horn facility without engaging in any public process to consider and disclose the potential environmental effects of their decision. This was arbitrary and capricious in violation of law. *See County of Santa Clara v. ICE*, No. 5:26-cv-05604, 2026 WL 2676965, at *10 (N.D. Cal. Sep. 11, 2026) (finding ICE's decision to not prepare an EIS or EA for new immigration detention facility was likely arbitrary and capricious); *see also Maryland v. Noem*, 823 F.Supp. 3d 560, 569–70 (D. Md. 2026) (finding that ICE and DHS "likely failed to comply

2021), https://www.dhs.gov/sites/default/files/publications/ice_el_paso_spc_final_ea_9-27-2021_508compliant.pdf.

with their obligations under NEPA" by "[deciding] to refrain from issuing an EIS or conducting an EA" before beginning work on an immigration detention facility).

**II. Defendants' actions are causing Colorado imminent and irreparable harm.**

Without an injunction, Colorado faces immediate irreparable harm. *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018). That harm is "both certain and great," *Colorado v. EPA*, 989 F.3d 874, 884 (10th Cir. 2021) (citation omitted), and it will be "difficult or impossible" for Colorado to be "restore[d] [to] the status quo" ex ante absent preliminary relief. *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). "Plaintiffs [meet] their burden to establish a likelihood of irreparable harm by showing that [the federal action] will have some environmental impacts, even if the extent of those impacts are not fully known." *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 25 (D.D.C. 2009).

Defendants' decision poses imminent and irreparable environmental harm in several areas: (1) wildlife and their habitat, (2) air quality, (3) water and wastewater resources, and (4) public health. These consequences are immediately impending because GEO Group is conducting construction and renovation activities on the property and actively hiring employees to staff the facility in furtherance of its contract. These harms, along with the procedural harm from Defendants' action, constitutes irreparable injury. *See Colorado v. EPA*, 989 F.3d at 888–89 ("harm [to State's] … wildlife, and water resources" is irreparable); *San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.*, 657 F. Supp. 2d 1233, 1241 (D. Colo. 2009) ("Plaintiffs' procedural interest in a proper NEPA analysis is likely to be irreparably harmed if [the Defendants] were permitted to go forward with the very actions that threaten the harm NEPA is intended to prevent, including uninformed decisionmaking."); *see also Brady*, 612 F. Supp. 2d at 24.

Colorado is also harmed by the bureaucratic momentum of Defendants' actions. When agencies disregard their procedural obligations, they can lock in decisions that are effectively impossible to unwind. *See Colo. Wild Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1221 (D. Colo. 2007) (The threatened injury "is not simply whatever ground-disturbing activities are conducted . . . before this action is decided, it is the risk that in the event . . . the agency is required to 'redecide' the access issue, the bureaucratic momentum . . . will skew the analysis and decision-making of the Forest Service towards its original, non-NEPA compliant access decision."); *Davis v. Mineta*, 302 F.3d 1104, 1115 n.7 (10th Cir. 2002) ("[I]f any construction is permitted . . . before the environmental analysis is complete, a serious risk arises that the [required NEPA analysis] will be skewed toward completion of the entire Project.").

NEPA's entire thrust is to ensure the federal agency can consider potentially serious environmental and state-local harms before a project is completed. The Court should enjoin further construction and operation until the lawful process occurs.

**III. The balance of equities and the public interest favor an injunction.**

The final two merged preliminary injunction factors require the Court to "balance the competing claims of injury and consider the effect on each party of the granting or withholding of the requested relief, paying particular regard [to] the public consequences" that would result from its decision. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation modified).

The irreparable harm to Colorado from denying the requested preliminary injunction outweighs any harm to Defendants from the limited delay resulting from the injunction for three reasons. First, Colorado's high likelihood of success on the merits strongly indicates that a preliminary injunction would serve the public interest. *See League of Women Voters of U.S. v.*

*Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). There is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (citation modified).

Second, the public interest also favors a preliminary injunction because of the serious and irreparable consequences to Colorado detailed above—harms for which there is no adequate remedy at law. *See Colorado Wild*, 523 F. Supp. 2d at 1223 ("The public has an undeniable interest in [an agency's] compliance with NEPA's environmental review requirements and in the informed decision-making that NEPA is designed to promote.") Indeed, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages . . . [and] [i]f such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *S.C. Dep't of Wildlife & Marine Res. v. Marsh*, 866 F.2d 97, 100 (4th Cir. 1989) (citation omitted). Construction and operation of the detention center may result in pollution and health hazards, threatening both public health and local ecosystems. *See supra* Section II.

Third, on the other side of the ledger, an injunction would pose little risk to the Defendants' interests. The proposed injunction is limited and targets only the facility at issue. It reasonably requests that Defendants maintain the status quo at the Big Horn facility until they comply with their obligations under federal law. Temporarily halting construction and operation would not harm Defendants' ability to continue to enforce federal immigration law, as the facility is not currently facilitating that purpose. *See County of Santa Clara*, 2026 WL 2676965, at *10 (rejecting ICE's argument in similar NEPA case that "delay of constructing one facility will materially impede their immigration enforcement efforts."). And "[o]pposite the slight inconvenience of a

delay in construction stands ongoing and possible future irreparable harms caused by Defendants' likely NEPA violation." *Maryland v. Noem*, 823 F. Supp. 3d at 572.

Without an injunction, GEO Group plans to complete renovations by the end of the year, which risks diminishing the options open to Defendants to the point that NEPA review "would become a meaningless formality." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 201 (4th Cir. 2005) (citation omitted). The public interest favors avoiding irreparable harm to the environment and public health, and cannot support the government's blatant disregard of the process required by federal law.

**CONCLUSION**

Colorado respectfully requests that this Court enter a preliminary injunction barring Defendants from renovating, constructing, retrofitting, or operating the Big Horn facility until the completion of an EA or EIS.

Dated: September 29, 2026

Respectfully submitted,

**PHILIP J. WEISER**
Attorney General of Colorado

*/s/ Carrie Noteboom*
***Carrie Noteboom***
Assistant Deputy Attorney General
***Sarah H. Weiss***
Senior Assistant Attorney General
***Sam Wolter***
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Carrie.Noteboom@coag.gov
Sarah.Weiss@coag.gov
Samuel.Wolter@coag.gov
*Attorneys for plaintiff State of Colorado*