**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| THE STATE OF COLORADO<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>Defendants. | Case No. 1:26-cv-04832 |

**DEFENDANTS' OPPOSITION**
**TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION .......... 1

BACKGROUND .......... 1

STANDARD OF REVIEW .......... 2

ARGUMENT .......... 3

I. The State lacks standing and fails to establish a likelihood of irreparable harm because it cannot show an actual injury. .......... 3

II. The State fails to establish a likelihood of success on the merits of its NEPA claim. .......... 6

III. The balance of equities favors denying the State's Motion. .......... 12

CONCLUSION .......... 13

# TABLE OF AUTHORITIES

**Cases**

*Alaska Ctr. for Env't v. U.S. Forest Serv.*,
189 F.3d 851 (9th Cir. 1999) ........................................ 10

*Back Country Horseman of Am. v. Johanns*,
424 F. Supp. 2d 89 (D.D.C. 2006) ........................................ 7, 9

*Beltronics USA, Inc. v. Midwest Inventory Distrib.*,
562 F.3d 1067 (10th Cir. 2009) ........................................ 2

*California v. Norton*,
311 F.3d 1162 (9th Cir. 2002) ........................................ 7

*Clapper v. Amnesty Int'l*,
568 U.S. 398 (2013) ........................................ 4, 5

*Colorado v. EPA*,
989 F.3d 874 (10th Cir. 2021) ........................................ 5

*Ctr. for Biological Diversity v. Salazar*,
706 F.3d 1085 (9th Cir. 2013) ........................................ 7

*Ctr. for Food Safety v. Vilsack*,
636 F.3d 1166 (9th Cir. 2011) ........................................ 4

*Denver Homeless out Loud v. Denver*,
32 F.4th 1259 (10th Cir. 2022) ........................................ 3

*Dep't of Educ. v. Brown*,
600 U.S. 551 (2023) ........................................ 5, 6

*Earth Island Inst. v. Muldoon*,
82 F.4th 624 (9th Cir. 2023) ........................................ 7, 9

*Friends of the Earth v. Laidlaw Env't Servs.*,
528 U.S. 167 (2000) ........................................ 3

*Hope v. Warden York Cnty. Prison*,
972 F.3d 310 (3d Cir. 2020) ........................................ 12

*Klamath-Siskiyou Wildlands Ctr. v. Grantham*,
785 F. App'x 467 (9th Cir. 2019) ........................................ 12

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) ........................................ 12

*Lujan v. Def. of Wildlife*,
504 U.S. 555 (1992) ........................................ 3, 4

*Maryland v. Mullin*,
831 F. Supp. 3d 325 (D. Md. 2026) ........ 11, 12

*Maryland v. Noem*,
823 F. Supp. 3d 560 (D. Md. 2026) ........ 13

*Mazurek v. Armstrong,*
520 U.S. 968 (1997) ........ 3

*Mountain Cmtys. for Fire Safety v. Elliott*,
25 F.4th 667 (9th Cir. 2022) ........ 10

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 3, 12

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ........ 6

*Save Long Beach Island v. U.S. Dep't of Com.*,
794 F. Supp. 3d 273 (D.N.J. 2025) ........ 7

*SCFC ILC, Inc. v. VISA USA, Inc.*,
936 F.2d 1096 (10th Cir. 1991) ........ 3

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025) ........ 6, 10, 11

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ........ 4, 6

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........ 2, 3, 12

**Statutes**

42 U.S.C. § 4336(a)(2) ........ 8

42 U.S.C. § 4336(b)(1)-(2) ........ 7

42 U.S.C. § 4336e(1) ........ 7

5 U.S.C. § 706 ........ 11

8 U.S.C. § 1231(g) ........ 1

8 U.S.C. §§ 1225-1231 ........ 1

## INTRODUCTION

This matter involves a challenge to the federal government's exercise of its core sovereign prerogative: administering the nation's immigration system and securing its borders. The State of Colorado seeks to enjoin the renovation and operation of an immigration detention facility at the site of a former prison in Hudson, Colorado, until the Department of Homeland Security (DHS) completes an Environmental Assessment (EA) or Environmental Impact Statement (EIS) under the National Environmental Policy Act (NEPA). But the State lacks standing to assert its claim because it cannot demonstrate a concrete injury. For the same reason, the State has not established that it will be irreparably harmed absent a preliminary injunction. The State has also failed to show that it is likely to prevail on the merits of its NEPA claim because the agency action that the State challenges is categorically excluded from further NEPA analysis. Finally, the balance of the equities and public interest favor denying preliminary injunctive relief because of the urgent need for detention space in the Denver area. The Court should deny the State's Motion, Dkt. No. 2.

## BACKGROUND

Under the Immigration and Nationality Act, DHS must detain broad categories of aliens pending removal and has discretionary authority to detain others. 8 U.S.C. §§ 1225-1231. Given the volume of noncitizens residing illegally in the United States, DHS requires ample detention space to comply with its obligations. 8 U.S.C. § 1231(g). One way to fulfill the need for detention space is through a services contract where DHS, acting through Immigration and Customs Enforcement (ICE), contracts with a private company to operate the privately owned facility as immigration detention. *See* Compl. ¶ 34, Dkt. No. 1 ("A large percentage of ICE detainees are held in facilities either owned or operated by private prison companies.").

In July 2026, DHS entered into a contract with GEO Group, Inc. for services at the Big Horn facility, which is a large prison in Hudson, Colorado, built in 2009 that GEO Group operated

until 2014. *See* Decl. of Amanda Stought (attached hereto) ¶ 3; Decl. of Carrie Noteboom Ex. 2, Dkt. No. 2-1 at 11. The Big Horn facility's location is zoned for industrial use, particularly for uses that the Town of Hudson has deemed appropriate for the highest levels of noise and pollution compared to other industrial districts, such as recycling facilities and cement production. Stought Decl. ¶ 6 (citing Town of Hudson Zoning Code, art. 5, § 16- 55(c)).

Under the terms of the contract, GEO Group will operate the existing prison as immigration detention with a 1,188-bed maximum capacity and approximately 1,132-detainee maximum. *Id.*; *id.* Ex. B at B-003. GEO Group will provide detention, transportation, housekeeping, and case process services. *Id.* No new water, sewer, or electrical service works are expected to support the facility as contracted. *Id.* ¶ 9. GEO Group will conduct modest work at the facility before operations begin. *See id.* ¶¶ 7-8. This work includes upgrading communications and security systems; repaving the main parking lot; adding new lots and modular trailer buildings for administrative staff, Immigration Judges, and transportation services; laying approximately 150 feet of new sidewalk to provide access to the modular trailer building that will house the immigration court; and installing new fencing and gates. *Id.* GEO Group has finished work on the main parking lot and fence. *Id.* ¶ 7.

## STANDARD OF REVIEW

To obtain the "extraordinary remedy" of a preliminary injunction, a movant must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 23 (2008); *Beltronics USA, Inc. v. Midwest Inventory Distrib.*, 562 F.3d 1067, 1070 (10th Cir. 2009) (clarifying that movant must establish all four factors "weigh in its favor"). "[T]he final two factors 'merge when the Government is the opposing party.'" *Denver Homeless out Loud v. Denver*, 32 F.4th 1259, 1278

(10th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Because a "preliminary injunction is an extraordinary and drastic remedy," *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (citation omitted), the party seeking a preliminary injunction must make "a clear showing that [it] is entitled to such relief." *Winter,* 555 U.S. at 22; *see also SCFC ILC, Inc. v. VISA USA, Inc*., 936 F.2d 1096, 1098 (10th Cir. 1991), *overruled on other grounds by O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004).

## ARGUMENT

The State's Motion for Preliminary Injunction fails out of the gate because the State cannot establish Article III standing to challenge the contract to operate the Big Horn facility. And even if the State could somehow demonstrate an injury-in-fact for standing, the State fails to meet the higher burden of showing that it is likely to be irreparably harmed absent a preliminary injunction. The State likewise fails to establish a likelihood of success on the merits of its NEPA claim, the only claim on which the State has moved for preliminary injunctive relief. Finally, the balance of equities tips sharply in favor of the public's interest in denying the State's requested relief. The Court should deny the State's Motion for a Preliminary Injunction.

### I. The State lacks standing and fails to establish a likelihood of irreparable harm because it cannot show an actual injury.

The State's alleged injuries are too speculative to satisfy Article III standing, which requires a plaintiff to show that it has suffered an actual or imminent injury—not conjectural or hypothetical. *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Imminent means "certainly impending," not speculative. *Lujan*, 504 U.S. at 564 n.2 (citation omitted). "Allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013) (citation modified); *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) ("[S]peculation does not suffice."). The

party invoking federal jurisdiction bears the burden of establishing an injury. *Lujan*, 504 U.S. at 561. In seeking a preliminary injunction, the burden of proof for irreparable injury is higher than standing. *See Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011). Thus, even if the State could establish an injury for standing, it still falls well short of showing *irreparable* harm to obtain a preliminary injunction.

The State cannot establish standing or the need for emergency relief because it fails to provide sufficient evidence that the State faces any actual or imminent injury without an injunction. The State speculates that the renovations and operations at the Big Horn facility could impact "(1) wildlife and their habitat, (2) air quality, (3) water and wastewater resources, and (4) public health." Pl.'s Mot. for Prelim. Inj. (Pl.'s Br.) 12. The State's entire basis for harm rests on the notion that impacts are unknown because ICE did not publish an EA or EIS. *Id.* at 7 (referring to "possible environmental harms" as *potential* impacts); *see also* Decl. of Shannon Schaller ¶ 15, Dkt. No. 2-2 (characterizing impacts as merely "potential"). But the impacts are *not* unknown. DHS already analyzed the environmental impacts for certain categories of actions. *See* Decl. of Andrew DeGregorio (attached hereto) ¶ 13. And the agency determined that the contract at issue here fits into at least three of those categories of actions that were already analyzed. *See id.* ¶¶ 13-17. Thus, the State's claims of harm are not supported.

The State's claims of harm are further flawed because they ignore that the Big Horn facility is in a highly industrialized area. *See* Stought Decl. ¶ 6. The State fails to explain how any incremental increase in noise or light pollution in this industrially zoned area actually harms the State's interests. For example, the State makes no effort to explain how its obligations under the Clean Air Act would be impacted, especially considering that the Big Horn facility is within a designated nonattainment area. *See* Pl.'s Br. 8; Compl. ¶ 60.

Similarly, the State points to a town planning document to claim that the Big Horn facility operations will increase the water demand. Pl.'s Br. 8, n.6. Even assuming that were true, the State fails to explain how expansion of Hudson's infrastructure will harm the State at all. *See id.* at 8. The State also cites an administrative proceeding involving Hudson's wastewater treatment process. *Id.* at 9 (citing Noteboom Decl. Ex. 8). But the State's reliance on past violations is misplaced because GEO Group implemented mitigation measures, resulting in no further violations involving the wastewater treatment system. *See* Noteboom Decl. Ex. 8 ¶¶ 21-23, Dkt. 2-1 at 172-73. In fact, GEO Group provided Hudson with equipment to improve water quality. *See id.* ¶ 32, Dkt. 2-1 at 176; Compl. ¶ 68. Given that the former prison operated at a higher capacity, *compare* Noteboom Decl. Ex. 8 ¶ 13, Dkt. 2-1 at 171 ("inmate capacity of 1,250"), *with* Stought Decl. Ex. B at B-003 (approximately 1,132-detainee maximum), and the treatment facility has improved since then, the State cannot establish any wastewater-related injury.

At most, the State shows that the renovations and operations at the Big Horn facility "may" impact the State's interests in wildlife, Schaller Decl. ¶ 9, or "may" burden public services, Pl.'s Br. 9. But the possibility of future harm is insufficient to establish standing. *Clapper*, 568 U.S. at 409. And "the mere possibility" of an adverse impact cannot support a finding of irreparable harm. *Colorado v. EPA*, 989 F.3d 874, 887, 890 (10th Cir. 2021) (vacating preliminary injunction because the State failed to show "a significant risk of irreparable injury").

Finally, deprivation of a procedural right alone does not establish injury; the State must show a "'concrete interest that is affected by the deprivation' of the claimed right.'" *Dep't of Educ. v. Brown*, 600 U.S. 551, 562 (2023) (quoting *Summers*, 555 U.S. at 496-97). "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Id.* The State's alleged procedural

harm is tied to its concerns about wildlife, water resources, public health, and air quality. *See* Pl.'s Br. 12. But as explained above, the State fails to show any concrete and imminent injury related to those issues. Absent that, the State lacks standing.

The State must offer sufficient evidence to show a likelihood of harm, but instead its theory of harm is mere speculation. The State fails to establish an injury to satisfy Article III standing. Consequently, the State cannot show it will be irreparably harmed absent a preliminary injunction. The Court need not consider any of the *Winter* factors because it lacks jurisdiction.

**II. The State fails to establish a likelihood of success on the merits of its NEPA claim.**

Even if the Court had jurisdiction to consider the State's claim and the State could somehow show imminent irreparable harm (which it cannot), the State's NEPA claim is still unlikely to succeed on the merits because the services contract is categorically excluded from further NEPA review. NEPA "is a purely procedural statute" that "does not require the agency to weigh environmental consequences in any particular way." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173 (2025); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989) ("[I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process."). It "is a procedural cross-check, not a substantive roadblock." *Seven Cnty.*, 605 U.S. at 173. A federal agency satisfies NEPA through (1) an EIS if the agency determines the action will have significant environmental impacts, (2) an EA to assess whether the action will have significant environmental impacts, or (3) a categorical exclusion (CE) for categories of actions that an agency has determined do not significantly affect the environment. *See* 42 U.S.C. § 4336(b)(1)-(2). Actions covered by CEs do not require an EA or EIS. 42 U.S.C. § 4336e(1).

"Application of a categorical exclusion is not an exemption from NEPA; rather, it is a form of NEPA compliance, albeit one that requires less than where an environmental impact statement or an environmental assessment is necessary." *Save Long Beach Island v. U.S. Dep't of Com.*, 794 F. Supp. 3d 273, 330 (D.N.J. 2025) (citation omitted). "[T]he entire point of categorical exclusions is to reduce the administrative burden of approving certain projects." *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 636 (9th Cir. 2023). Thus, "[i]n many instances, a brief statement that a categorical exclusion is being invoked will suffice." *California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002). CEs are not loopholes. *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013) ("Application of a categorical exclusion is not an exemption from NEPA; rather, it is a form of NEPA compliance[.]"). Instead, they are streamlined environmental reviews that contain several procedural safeguards to categories of actions that normally do not have significant environmental effects. "[A]n agency's decision to classify a proposed action as falling within a particular categorical exclusion will be set aside only if a court determines that the decision was arbitrary and capricious." *Back Country Horseman of Am. v. Johanns*, 424 F. Supp. 2d 89, 99 (D.D.C. 2006) (citation modified).

Although the agency did not formally apply a CE to the contract before it was signed due to an oversight, the agency has since explained that a CE applies. DeGregorio Decl. ¶ 17. For example, CE E2 covers new construction upon, or improvement of, land where all of the following conditions are met:

> (a) The structure and proposed use are compatible with applicable Federal, tribal, state, and local planning and zoning standards and consistent with federally-approved state coastal management programs,
> (b) The site is in a developed area and/or a previously-disturbed site,
> (c) The proposed use will not substantially increase the number of motor vehicles at the facility or in the area,
> (d) The site and scale of construction or improvement are consistent with those of existing, adjacent, or nearby buildings, and,

> (e) The construction or improvement will not result in uses that exceed existing support infrastructure capacities (roads, sewer, water, parking, etc.).

DHS NEPA Manual A-8, Noteboom Decl. Ex. 7, Dkt. No. 2-1 at 141. Subpart (a) is met because the facility is compatible with planning and zoning standards. DeGregorio Decl. ¶ 7 (“The facility is located within the Town of Hudson’s I-3 zoning district, which accommodates industrial uses that have the highest allowed amounts of noise and pollution compared to other industrial districts, including uses such as recycling facilities and cement production.”). The facility also satisfies subpart (b) because the area has been previously disturbed, given its history as a prison, and the facility is within and adjacent to industrial zoning designations. *Id.* ¶ 7. As for subpart (c), there is no evidence that the facility will substantially increase traffic relative to the former prison that operated on the site. The facility also meets subpart (d) because the site and scale of the work under the contract is consistent with the existing building—in fact, the footprint of the facility will not be expanded. *Id.* ¶¶ 10, 17. Last, the work to be completed under the contract satisfies subpart (e) because it will not result in uses that meaningfully exceed existing support infrastructure capacities like roads, sewer, water, and parking. *Id.* ¶¶ 11, 12 (explaining that no electricity, water, or sewer upgrades are anticipated, and only 44 parking spots will be added to the facility’s large parking lot). Therefore, E2 would reasonably apply to work under the Facility Service Contract.[1] *See* 42 U.S.C. § 4336(a)(2) (noting no EIS or EA is required where “the proposed agency action is excluded pursuant to one of the agency’s categorical

[1] The State vaguely claims that the facility’s operations will involve extraordinary circumstances. Pl.’s Br. 6 n.3. But NEPA does not address extraordinary circumstances for categorical exclusions, and such vague allegations fall far short of establishing that any such circumstances would render application of E2 somehow improper.

exclusion"); *Back Country Horseman of Am. v. Johanns*, 424 F. Supp. 2d 89, 99 (D.D.C. 2006) (holding that an "agency had no obligation to formally document its decision" to apply a CE); *Earth Island Inst.*, 82 F. 4th at 636 ("Where agency action falls under a categorical exclusion, it need not comply with the requirements of an environmental impact statement or environmental assessment." (citation modified)).

The agency could also rely on CE B3, which is for "[p]roposed activities and operations to be conducted in an existing structure that would be compatible with and similar in scope to its ongoing functional uses and would be consistent with previously established safety levels and in compliance with applicable Federal, Tribal, State, or local requirements to protect the environment." DHS NEPA Manual A-3, Noteboom Decl. Ex. 7, Dkt. No. 2-1 at 136. The service contract fits within this category. First, operations under the service contract will not require any expansion of the former prison's footprint, thus the activities will be conducted in an existing structure. *See* Stought Decl. ¶ 7. Second, the facility at issue was a prison, and the contracted operations are for a detention facility with similar capacities. *Compare* Noteboom Decl. Ex. 8, ¶ 13, Dkt. No. 2-1 at 171 ("inmate capacity of 1,250"), *with* Stought Decl. Ex. B at B-003 (approximately 1,132-detainee maximum). Thus, the contemplated operations under the service contract are compatible with and similar in scope to the facility's "existing functionality." DeGregorio Decl. ¶ 17. Operations at the detention center will follow existing National Detention Standards, which will ensure safety at the site. *Id.* ¶ 10.

Likewise, CE A5 would apply to work under the Facility Service Contract. CE A5 applies to "[a]warding of contracts for technical support services, ongoing management and operation of government facilities, and professional services that do not involve unresolved conflicts concerning alternative uses of available resources." DHS NEPA Manual A-2, Noteboom Decl. Ex.

7, Dkt. No. 2-1 at 135. The contract at issue is for technical support of federal detention services. DeGregorio Decl. ¶ 9 ("The contract provides for the operation of a 1,188-bed detention facility. The contract includes detention services, transportation services, housekeeping services, and case processing services."). Thus, CE A5 would reasonably apply to implementation of the Facility Service Contract. "But in selecting a CE for a project, the [agency] only needs to cite and rely on one CE, even if other CEs may apply." *Mountain Cmtys. for Fire Safety v. Elliott*, 25 F.4th 667, 679-80 (9th Cir. 2022). And the agency's determination about whether a particular CE applies is entitled to deference and should be upheld. *See Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857 (9th Cir. 1999) (holding that an agency's interpretation of the scope of its own CE is "given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation" establishing the CE).

Finally, any error by the agency in applying and documenting application of the CE would be harmless because there is no reason to expect that the agency would make a different decision on remand. Instead, as discussed above, a CE applies, and there is no "reason to believe that the agency might disapprove" the services contract if it were remanded for additional analysis. *Seven County*, 605 U.S. at 169. As *Seven County* explained:

> The ultimate question is not whether an EIS in and of itself is inadequate, but whether the agency's final decision was reasonable and reasonably explained. Review of an EIS is only one component of that analysis. Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS.

*Seven County*, 605 U.S. at 184-85; *see also* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."). Even if the Court finds that the agency did not properly determine a CE applied before approving the contract, that failure would be harmless and would not establish that the State is likely to succeed on its NEPA claim.

The State's focus on DHS's past preparation of EAs for other processing and detention facilities is irrelevant. The Big Horn facility will have different and lesser environmental impacts than the detention facilities the State identifies, which all involved constructing new buildings on undeveloped land, not operating an existing prison facility. *See* Pl.'s Br. 10-11. The agency's decision to prepare an EA for other facilities does not create a policy or requirement for DHS to do so for all other processing and detention centers in all places. Environmental impacts are necessarily site-specific, so the State's reliance on instances where DHS prepared an EA is misplaced. *See id.* at 10 n. 10. (listing other facilities with EAs).

Similarly, the District of Maryland's recent decision in *Maryland v. Mullin*, 831 F. Supp. 3d 325 (D. Md. 2026), does not apply here because that case involved the purchase of a warehouse, whereas here DHS has contracted for services to be rendered at an existing prison. The *Maryland* decision also has significant flaws that should limit its application here for at least four reasons. First, the court in that case considered factors irrelevant to NEPA compliance such as the time it took the agency to prepare its NEPA analysis. *See Mullin*, 831 F. Supp. 3d at 336 ("what review was done appears to have proceeded at a rocket's pace"), *id.* at 341 ("just hours before Defendants purchased the Williamsport Warehouse, they completed a Record of Environmental Consideration[(REC)]"), *id.* at 364 ("the Court has serious concerns about the timing of Defendants' decision-making"). Second, the court did not consider that merely acquiring real estate does not implicate NEPA obligations. Third, the court misinterpreted the DHS NEPA Manual to apply a much broader meaning of the phrase "functional use" in the Repair and Maintenance CE. *Id.* at 365-66. Fourth, the court conflated the project's *construction* specifications, which do not include any capacity-related improvements, with the ultimate *operation* of the facility. *Id.* (suggesting that the REC contained inconsistencies about the planned retrofit).

In short, the State is not likely to succeed on the merits of its NEPA claim. The services contract fits within a CE, so the agency does not have to conduct further NEPA analysis. The Court should therefore deny the State's Motion.

**III. The balance of equities favors denying the State's Motion.**

When one party is a United States agency, the public interest and the agency's interest merge. *See Nken*, 556 U.S. at 435. A federal court must deny a preliminary injunction, even where irreparable injury to the movant exists, if the injunction is contrary to the public interest. *See Winter*, 555 U.S. at 23-24; *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 332 (3d Cir. 2020) (vacating orders granting emergency relief because district court failed to properly analyze the public interest factor); *see also Klamath-Siskiyou Wildlands Ctr. v. Grantham*, 785 F. App'x 467, 469 (9th Cir. 2019) (finding that district court abused its discretion when it issued a preliminary injunction without paying "particular regard for the public consequences"). The Court may not abandon a balance of harms analysis just because a potential environmental injury is at issue. *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008), *overruled in part on other grounds by Winter, 555 U.S. 7*.

Here, the significant national interest in combatting unlawful immigration favors allowing ICE to continue taking necessary steps to renovate, upgrade, and operate the Big Horn facility. *See* Decl. of Monica Burke (attached hereto) ¶¶ 7-8 (explaining that the Big Horn facility's utility in detaining aliens operationally benefits ICE and furthers its immigration enforcement mission). Currently, ICE is facing elevated detention needs because of its current enforcement posture and increased interior enforcement activity. *Id.* ¶ 8. The Denver Area of Responsibility (AOR) covers all of Wyoming and Colorado. Currently, ICE's detainment capacity in this AOR and in neighboring states like Nebraska, Kansas, Utah, and Wyoming is limited. *Id*. And presently, there is only one detention facility in Colorado. *Id.* Practically, this means that in periods of elevated

demand for bed space, long-distance transfers are required to relocate detainees to available detention centers. *Id.* The lack of local detention complicates the safe, secure, and humane management of individuals in ICE custody. *Id.* And placement in detention facilities far from an individual's community may limit that detainee's access to family, legal counsel, and other support services. *Id.*

An injunction delaying ICE's ability to provide detention space for these individuals is not in the public interest. *See* Pl.'s Proposed Order, Dkt. No. 2-3 (proposing order that enjoins DHS from "implementing their decision to enter into a contract for the renovation and operation of the Big Horn immigration detention facility until all requirements under NEPA have been satisfied."). This delay is more than a "slight inconvenience" to DHS's immigration enforcement. Dkt. No. 2 at 14-15 (quoting *Maryland v. Noem*, 823 F. Supp. 3d 560, 572 (D. Md. 2026)). Delay harms the immigration enforcement prerogative of the Federal Government and would mean that DHS will continue to incur the operational costs of transporting detainees away from their communities, family, and legal representation to distant detention facilities with available capacity. In comparison to the speculative future harms claimed by the State, *see supra* Section I, the public interest and balance of the equities favor denial of the State's Motion.

**CONCLUSION**

Because the State of Colorado fails to demonstrate an actual injury, the State lacks standing to assert its NEPA claim challenging the Department of Homeland Security's services contract with GEO Group, Inc. to renovate and operate the existing prison facility in Hudson, Colorado. And because the State does not have an actual injury, it cannot show irreparable harm absent preliminary injunctive relief. The State also fails to show a likelihood of success on the merits of its NEPA claim. And the balance of the equities and public interest favor denying the State's

requested injunction. The Court should therefore deny the State's Motion for Preliminary Injunction, Dkt. No. 2.

Respectfully submitted on this 19th day of October 2026,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Energy & Natural Resources Division
United States Department of Justice

*<u>/s/ Jordan P. Cohen</u>*
JORDAN P. COHEN (CO Bar No. 55298)
Trial Attorney
Natural Resources Section
999 18th Street
North Terrace, Ste. 600
Denver, CO 80202
(202) 598-9094
jordan.cohen@usdoj.gov

HAYLEY A. CARPENTER (CA Bar No. 312611)
KRYSTAL-ROSE PEREZ (TX Bar No. 24105931)
Natural Resources Section
P.O. Box 7611
Washington, DC 20044
(202) 305-0242 (Carpenter)
(202) 305-0486 (Perez)
hayley.carpenter@usdoj.gov
krystal-rose.perez@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 19th day of October, 2026, the foregoing was electronically filed with the Clerk of the Court and served using the CM/ECF system upon all attorneys of record.

*/s/ Jordan P. Cohen*
Jordan P. Cohen